# Exhibit A

| | |
|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., <br><br> Claimant, <br><br> v. <br><br> LANDSCAPE SPECIALISTS, INC., <br><br> Respondent. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **CLAIMANT'S DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM** |

## INTRODUCTION

This case concerns an insured's breach of its contractual obligations to its workers' compensation carrier. The insured, Landscape Specialists, Inc. ("*Landscape*"), is a construction and landscaping company with hundreds of employees. Landscape contracted for workers' compensation coverage with National Union Fire Insurance Company of Pittsburgh, PA ("*NUFIC*"). NUFIC issued the policies from February 1, 2012 through February 1, 2016 (the "*Policies*"). Pursuant to the Policies, and related agreements, Landscape is responsible for reimbursing NUFIC for the first $250,000 paid on each claim. Landscape has refused to make reimbursement payments for over a year, and currently owes NUFIC well over $1 million for paid losses within the retention, and counting. Landscape is also contractually obligated to post additional collateral to secure its obligations to NUFIC, but refuses to do so, leaving NUFIC substantially under-secured on a delinquent account. Claimant seeks an award of money damages equal to the total amount of losses it paid within Landscape's retention, and other amounts Claimant owes; an order requiring Landscape to pay all future amounts owed when due; an order

requiring Landscape to post adequate collateral as required by the parties' contracts; and other relief including an award of interim security, attorneys' fees and costs.

As set forth below, the Policies at issue are retrospectively rated workers' compensation policies with a $250,000 retention. Landscape paid NUFIC an estimated premium at the inception of each Policy. The estimated premium was based on a contractual formula keyed to Landscape's payroll and expected loss experience. The final premium, however, is not finally determined until all claims under the Policies are resolved. Because workers' compensation policies typically have long tails, the Policies and related governing agreements require NUFIC to perform periodic adjustments ("*Program Adjustments*") that take into account, among other things, paid and anticipated losses, claims service fees and payroll audits. When such an adjustment is made, the Policy premium goes up or down based on these and other factors. These Program Adjustments are done annually pursuant to the Policies and a separate agreement – the "*Payment Agreement*" (described below) – which provides that, upon demand, Landscape is obliged to pay NUFIC any adjusted amounts.

Significantly, although under each of the Policies Landscape is responsible for paying the "*Retained Amount*," which includes a policy deductible of $250,000 per claim, NUFIC is obligated to pay claims in full and to later seek reimbursement of the Retained Amount from Landscape. NUFIC bills Landscape for paid losses ("*Loss Invoices*") on a monthly basis, and Landscape is obligated to pay the Loss Invoices within thirty days. All of this creates a creditor-debtor relationship that leaves NUFIC, as creditor, exposed to the substantial risk that Landscape will not pay NUFIC for the coverage NUFIC provides. To secure Landscape's obligations to pay, the Payment Agreement requires Landscape to post collateral in an amount initially determined at the inception of each Policy. As loss experience develops and payrolls are audited, NUFIC may

require additional collateral to secure Landscape's adjusted estimated obligations. This process continues until the Policy tail has run out and the insurance program is terminated.

Following many months of Landscape's refusal to pay Loss Invoices, NUFIC performed a collateral review valued as of September 2016 and determined that it required additional collateral to secure Landscape's estimated obligations. The collateral review was driven by negative loss experience, *i.e.*, there were more losses than anticipated at inception, and Landscape was in default on twelve months of Loss Invoices. Indeed, as of September 2016, Landscape failed to pay Loss Invoices totaling $945,380 (and that amount has grown since September 2016), and premium adjustment fees of $37,826. In addition, the total estimated future losses on the four Policies was initially $2,439,315. NUFIC estimated in September 2016, based on Landscape's dismal loss experience, total losses of $4,464,111. As a result of the collateral review that NUFIC performed as contemplated by the Payment Agreement, it was determined that NUFIC requires (as of September 2016) an additional $842,587 in collateral to secure Landscape's future obligations (not including the unpaid Loss Invoices and other amounts owed). Landscape refuses to pay the Loss Invoices or to post additional collateral, thus constraining NUFIC to file this Demand for Arbitration and Statement of Claim ("*Demand*").

## BACKGROUND

### A. The Insurance Program

NUFIC issued workers' compensation Policies to Landscape for four policy years, beginning in February 2012 and lasting through February 2016. Landscape is responsible for paying a Retained Amount on each claim of $250,000, but NUFIC was (and is) responsible for paying the entirety of the claim in the first instance. NUFIC bills Landscape monthly for paid

losses – the amounts NUFIC pays to workers' compensation claimants up to the $250,000 Retained Amount.

The Policies that make up the program were written on a retrospective rating basis, meaning that for each Policy Landscape paid to NUFIC a *preliminary estimate* of the total premium that could ultimately be owed to NUFIC. Landscape knew that if the cost of its insurance changed or loss experienced worsened, its premium would be increased. This allowed Landscape to incur a fixed upfront cost and wait and see what the total cost for the program would be.

For each Policy year, Landscape paid the estimated premium in set installments over the course of the year. That premium covered, among other things, estimates of (i) the fee paid to compensate NUFIC for the risk it was taking on, (ii) the taxes and surcharges assessed in connection with the Policy, (iii) the amount NUFIC would have to advance to claimants within the Retained Amount, and (iv) allocated loss adjustment expenses ("*ALAE*"). Landscape's estimated total payment to NUFIC for the first Policy year was $996,383.

As with any estimate, however, and according to the parties' agreements, the estimated amounts could be adjusted up or down in a Program Adjustment, based on Landscape's payroll and actual loss experience, among other things. Thus, for example, as stated above the first year's estimated cost to Landscape was $996,383, which included payment of $590,773 within the Retained Amount. If claims experience was worse than expected, and NUFIC paid $800,000 instead of $590,773 in paid losses within the Retained Amount, Landscape would be required to pay the difference. Similarly, the estimated cost of $996,383 to Landscape for the first policy year included estimates of the ALAE, and actual payroll. If claims were more expensive to administer, or payroll increased, the cost to Landscape would change.[1]

---

[1] Program Adjustments are performed annually and the conditions under which the adjustments occur are laid out in the "Large Risk Rating Plan Endorsement" ("*LRRP*"), which was issued in connection with and

4

Because Landscape paid only an estimate of its total premium upfront, NUFIC took on a significant credit risk.  Landscape could owe NUFIC additional amounts, but Landscape could skirt its duty to pay NUFIC, thus leaving NUFIC on the hook to provide substantial coverage for less consideration than agreed to by the parties.  To induce NUFIC to issue the Policies in the face of the risk of non-payment by Landscape, Landscape agreed to enter into a separate agreement with NUFIC, called the "*Payment Agreement*."  The Payment Agreement defines, among other things, Landscape's obligation to pay premiums, Loss Invoices and Program Adjustments; Landscape's obligation to post collateral; the parties' rights and obligations in the event of Landscape's default; and the mechanism for resolving disputes.

## B. The Insurance Policies

NUFIC ultimately issued four workers' compensation Policies that went into effect on February 1 of each year from 2012 through 2016.  Below is a summary of Landscape's Policies and the estimated total of the Retained Amount for each year:

| Policy No. | Effective Date | Estimated Total of Insured's Retained Amount at Inception |
|---|---|---|
| WC 021417723 | 2/1/2012 | $590,773 |
| WC 048250235 | 2/1/2013 | $501,000 |
| WC 049342351 | 2/1/2014 | $550,000 |
| WC 049342509 | 2/1/2015 | $797,542 |

Numerous claims were made on each Policy.  NUFIC administered and defended the claims, sent Landscape Loss Invoices, performed Program Adjustments, and otherwise held up its end of the bargain to provide workers' compensation coverage.

---

governs each of the Policies.  The LLRP for each Policy is attached hereto as Exhibits 1-4. When a Program Adjustment is performed, Landscape is billed for any increase in the premium and, conversely, credited for any refund of premium when appropriate.

### C. The Payment Agreement

*Purpose of the Agreement*. As set forth above, NUFIC acts as a creditor to Landscape because NUFIC pays claimants in the first instance and then seeks reimbursement of those payments, up to the Retained Amount, from Landscape. Similarly, the total cost of the insurance program – not only paid losses within the Retained Amount but also premium, ALAE and taxes/surcharges, *etc.*, is only estimated at the inception of each policy and then billed to Landscape. Those amounts may increase. While NUFIC expects Landscape to honor its promise to pay, Landscape may fail to do so. The Payment Agreement is a separate contract between NUFIC and Landscape that governs the parties' credit relationship, and is designed to protect NUFIC from the risk of Landscape's default.

The parties entered into a Payment Agreement in 2012, along with a schedule of applicable Policies ("*Schedule*"), attached hereto respectively as Exhibits 5 and 6. The Payment Agreement provides that it is applicable to the policies in the Schedule, along with any "renewals, revisions, replacements or additions" to those policies. *See* Payment Agreement, 3. For each subsequent year, NUFIC issued additional Schedules that would be bound to the Payment Agreement. *See* Exhs. 7-9. In addition, the Payment Agreement was subject to two addendums, one issued in 2013 (Exh. 10) and one issued in 2014 (Exh. 11).

The Payment Agreement generally defines the parties' arrangement as follows: (i) NUFIC agrees to provide Landscape with insurance coverage according to the underlying Policies (and their related agreements and endorsements), and to invoice Landscape for any additional payment obligations that arise by virtue of any Program Adjustments; and (ii) Landscape agrees, among other things, to satisfy all its payment obligations to NUFIC. Payment Agreement at 3. The Payment Agreement became effective simultaneously with the first Policy and ends "*only after*

[Landscape] and [NUFIC] have settled and paid all obligations" under the Payment Agreement. *Id.* (emphasis added).

*Landscape's "Payment Obligation."* The key definition of the Payment Agreement is the term "*Your Payment Obligation*", which defines the insured's broad obligation to pay NUFIC premiums, advances of the Retained Amount, all amounts shown in the Policies (including the LRRP), expenses, ALAE, taxes, and surcharges, among other things. *See* Payment Agreement, Mandatory Addendum at ¶ 2. Landscape expressly agreed "to pay Your Payment Obligation." *See* Payment Agreement, at 3. Moreover, Landscape agreed to pay its Payment Obligation pursuant to the timetable set forth in the Schedule attached to each Payment Agreement, and to pay any additional payments such as Loss Invoices and Program Adjustments within thirty days of any invoice. *See* Payment Agreement, Mandatory Addendum at ¶ 4.

*Collateral Under The Payment Agreement*. The Payment Agreement requires Landscape to post collateral to secure its promise to pay NUFIC for the coverage NUFIC provides. *See* Payment Agreement, at 6-7. Landscape is initially required to post collateral "in the amount(s) shown in the Schedule" to the Payment Agreement. *Id*. at 6. However, the Payment Agreement expressly grants NUFIC the right to require additional collateral to secure Landscape's Payment Obligation. *Id*. at 6 ("COLLATERAL REVIEWS"). NUFIC may review its "collateral requirement at any time that [NUFIC] may deem reasonably necessary." Significantly, the Payment Agreement expressly states that: "If as result of any review we find that we require additional collateral, You [Landscape] will provide us such additional collateral within 30 days of our written request." *Id*.

*Defaults, Disputes and Arbitration Under The Payment Agreement*. Pursuant to the Payment Agreement, Landscape is in default if it fails to pay make any required payment or satisfy

any obligation "within 5 days after its due date", *id*. at 7, with the due date ordinarily being thirty days after a demand for payment is made. Upon any default, NUFIC may, among other things, accelerate any unpaid amounts of the Payment Obligation, apply the collateral to the remaining balance of the Payment Obligation, and require additional collateral. *See* Payment Agreement, Mandatory Addendum at ¶ 2.

Landscape, however, maintains the right to challenge NUFIC's calculation of the Payment Obligation. Should it do so, it must provide NUFIC with "written particulars" about any specific item it disputes, and pay the remaining items. *See* Payment Agreement, at 8. And, Landscape must serve written particulars "within the time allowed for payment." *Id*. This means that Landscape has thirty days to provide written particulars with respect to any invoice or Program Adjustment. *Id*. at 4 ("WHEN MUST YOU PAY YOUR PAYMENT OBLIGATION"). Landscape is thus obliged to review each invoice on a timely basis, with its risk manager or other professionals should it choose to do so, and voice any objections or concerns before payment is due, so they can be addressed quickly and efficiently. This provision is crucial to NUFIC. It is designed to keep payments on track while creating a real-time record of any *bona fide* disputes. It also allows NUFIC to address and remedy any mistakes, so they do not repeat in the future. This provision precludes insureds from failing to pay invoices on a serial basis, only to later proffer some manufactured excuse for its conduct.

Any unresolved disputes under the Payment Agreement, including but not limited to any dispute over written particulars, "must be submitted to arbitration." *Id*. at 8. Arbitration is before a panel of three arbitrators. Significantly, arbitration under the Payment Agreement is expedited with little or no discovery. The parties "must both submit [their] respective cases to the arbitrators within 30 days of the appointment of the third arbitrator" – a timeframe that does not permit much,

8

if any, pre-hearing activity. *Id*. at 9. Moreover, the Payment Agreement contemplates informal industry arbitration; the arbitration panel "must interpret" the Payment Agreement "as an honorable engagement and not merely a legal obligation. They are relieved of all judicial formalities. They may abstain from following the strict rules of law. They must make their award to effect the general purpose of this Agreement in a reasonable manner." *Id.*

## LANDSCAPE'S BREACHES

Losses and expenses on this insurance program, for each Policy year, have been well in excess of what was anticipated at inception. The following chart indicates the difference between anticipated losses at inception and as of September 30, 2016:

| Policy No. | Effective Date | Estimated Total of Insured's Retained Amount at Inception | Estimated Total of Insured's Retained Amount as of 9/30/16 |
|---|---|---|---|
| WC 021417723 | 2/1/2012 | $590,773 | $1,276,232 |
| WC 048250235 | 2/1/2013 | $501,000 | $753,293 |
| WC 049342351 | 2/1/2014 | $550,000 | $1,532,215 |
| WC 049342509 | 2/1/2015 | $797,542 | $902,371 |
| **TOTAL:** | | **$2,439,315** | **$4,464,111** |
| *DIFFERENCE BETWEEN ESTIMATED LOSS AT INCEPTION AND 9/30/16:* | | | *$2,024,796* |

Were the increased estimates of Landscape's losses not worrisome enough, Landscape ceased paying Loss Invoices on a regular basis as of *September 2015*. No written particulars were provided. As a result, NUFIC performed a collateral review in accordance with the Payment Agreement and, on February 17, 2016, demanded additional collateral. *See* Exh. 12. Landscape had initially posted $1,651,360 in collateral when the four Policies incepted, but given the increased loss estimates and history of defaults, more collateral was plainly required. NUFIC provided Landscape with a security calculation showing that an additional $660,942 in collateral was needed, and that Landscape was also required to pay $293,587 for outstanding Loss Invoices,

9

for a total due of $954,529. *Id.*

Landscape refused to pay *any* of these amounts, including the Loss Invoices in default. Significantly, Landscape chose not to provide any written particulars objecting to any aspect of NUFIC's demand for payment and collateral, just as Landscape provided no written particulars when it defaulted on the Loss Invoices when they first came due. Landscape was simply unwilling or unable to pay.

On April 12, 2016, following discussions with Landscape to clear up the defaults and shore up the collateral, NUFIC sent Thomas Hernandez, Landscape's President, an email indicating that Landscape owed $331,327.03 for unpaid Loss Invoices covering the period October 2015 – February 2016. At that time, NUFIC, although under no obligation to do so, offered to put Landscape on an installment payment plan in which Landscape would be given additional time to clear up the balance (pursuant to a promissory note at a modest interest rate).

On April 15, 2016, Mr. Hernandez rejected the installment payment plan NUFIC offered, and instead asked NUFIC to apply the existing collateral of $1,651,360 towards the outstanding, and any future, Loss Invoices. NUFIC advised Mr. Hernandez on that same day that NUFIC could not use the collateral in that fashion, because NUFIC was already under-secured given the sharp increase in estimated losses. And, far from using the existing collateral to pay the Loss Invoices, NUFIC advised Landscape that NUFIC needed additional collateral of $660,942, as set forth in the February 2016 security calculation. *See* Exh. 12. NUFIC once again demanded that Landscape comply with its contractual obligations and pay what it owed.

Subsequently, on April 19, 2016, and only *after* Landscape asked NUFIC to use the collateral to pay the Loss Invoices without objecting to the amount of any invoice (thus demonstrating that, as of that time, Landscape did not dispute *what* it owed, only *how* it would pay

10

it), Mr. Hernandez claimed for the first time in an email that he did not pay the Loss invoices because he had a "dispute" as to "how claims are handled." Mr. Hernandez subsequently on April 26, 2016 alleged in an email that NUFIC, its claims administrator and counsel were not adequately handing workers' compensation claims, resulting in alleged overpayments. Mr. Hernandez, however, did not reference any particular claim, let alone explain how it was mishandled. NUFIC responded to Mr. Hernandez on June 16, 2016. Among other things, NUFIC, seeking to resolve any dispute, asked Mr. Hernandez if there were specific claims that he wanted NUFIC to review that Landscape believed were mishandled. Mr. Hernandez did not identify any specific claims.

NUFIC followed up with Mr. Hernandez on July 11, 2016, suggesting a call to discuss Landscape's claims mishandling allegation. Mr. Hernandez did not respond to that email, so on August 11, 2016, NUFIC again contacted Mr. Hernandez by email demanding a response. Mr. Hernandez responded later that day, raising wholly trivial issues with respect to only four claims (out of the many hundreds that were filed against the Policies). For one of the claims, Mr. Hernandez's only complaint was that an employee's lawyer had rescheduled a deposition. For two others, Mr. Hernandez's only complaint was that Landscape's appointed counsel had not yet reported on the results of mandatory settlement conferences. For the fourth, Mr. Hernandez was upset that a worker had to wait two weeks instead of 5-7 days to receive a disability payment. None of these complaints raised any substantial concerns about claims handling. Rather, they constitute the flimsiest excuses for not paying NUFIC over $1,000,000 that Landscape clearly owes.

NUFIC responded to Mr. Hernandez's email promptly on August 18, 2016, explaining the facts of each case. The deposition was postponed "due to family emergencies"; one settlement conference was taken off-calendar for further discovery, and the other was improperly noticed;

and the disability check was timely sent. None of Mr. Hernandez's complaints about four claims (out of hundreds), minor as they were, had any merit.[2] Landscape was merely seeking to delay resolution of this matter for as long as possible.

On September 30, 2016 NUFIC performed another security calculation. *See* Exhibit 13. At that time, it determined that Landscape needed to post an additional $842,587 in collateral, and pay $945,380 in unpaid Loss Invoices, plus $37,826 in premium and fees, for a total amount of $1,825,793. Since then, Landscape has continued to default by failing to pay every monthly Loss Invoice NUFIC has sent, including, among others, the November 13, 2016 invoice ($126,118.35), the December 12, 2016 invoice ($118,688.92), and the January 12, 2017 invoice ($86,020.06).

NUFIC and Mr. Hernandez continued to talk sporadically through the remainder of 2016 and early 2017, but Landscape continued to ignore Loss Invoices, letting them pile up, and continued to demand that NUFIC draw on the collateral to satisfy those invoices (despite purportedly objecting to them based on alleged claims mishandling), while refusing to post additional collateral as required by the Payment Agreement.

---

[2] Pursuant to the Payment Agreement (at 4, "WHAT ELSE SHOULD YOU KNOW ABOUT YOUR PAYMENT OBLIGATION?"), Landscape must pay for losses and ALAE so long as NUFIC and its claims service provider acted "in the absence of negligence and in good faith under any of the Policies." This means that, so long as any claim was handled reasonably and in good faith, even if such claim could have been handled more perfectly, NUFIC is entitled to reimbursement of paid losses within the Retained Amount, and ALAE. This modest standard, along with the requirement that any dispute over any invoice be made with "written particulars" and within thirty days, is one of necessity: it would be too easy for any insured to dodge its Payment Obligation by failing to make payments without saying why, only to later raise generic "claims mishandling" as an excuse for non-payment. Insureds like Landscape under the Payment Agreement are required to raise disputes promptly, and only disputes which raise *bona fide* questions of bad faith or negligence are entitled to additional scrutiny. Rescheduling a deposition, allegedly failing to report on a settlement conference, or allegedly waiting a few extra days to send a disability check do not raise issues of negligence or bad faith. Landscape has put forth no plausible basis excusing or justifying its many defaults, and its knee jerk, after-the-fact "claims mishandling" defense is entitled to no weight at all. Indeed, Landscape's "claims mishandling" defense is precluded due to its failure to provide written particulars within the designated timeframe to do so.

## DEMAND FOR ARBITRATION

Pursuant to the Payment Agreements, NUFIC demands that Landscape select its party appointed arbitrator and provide notice to NUFIC of the same within thirty (30) days of the date of this Demand.  *See* Payment Agreement, Mandatory Addendum, at ¶ 7.  All party appointed arbitrators must satisfy the qualifications set forth in the Payment Agreement, which stipulates that "all arbitrators must be executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officials in an industry similar you *Yours*, domiciled in the United States of America not under the control of either party to this Agreement."  *Id.*

## STATEMENT OF VENUE

Once assembled, the arbitration panel shall determine where any arbitration proceedings will take place.

## DEMAND FOR RELIEF

Landscape has materially breached its Payment Obligations under the Payment Agreement by failing to pay invoices and to post collateral as it is required to do.  NUFIC seeks an award: (i) of damages equal to all unpaid Loss Invoices, unpaid expenses and premium, and interest thereon, plus attorneys' fees, costs and expenses incurred in connection with this arbitration and NUFIC's investigation and discovery of the facts prior to commencing this arbitration; (ii) ordering Landscape to pay any future invoices until all claims are resolved and the parties agree in writing that all claims have been closed or mutually agreed as to value; and (iii) compelling Landscape to post collateral in accordance with the terms of the Payment Agreement.[3]

---

[3] NUFIC will provide the arbitration panel with a revised security calculation showing the amount of unpaid Loss Invoices, unpaid expenses and premium as of the date of the hearing, as well as NUFIC's collateral needs based on its most current estimates of future losses and expenses.

In addition, NUFIC shall make a motion for interim security as soon as the Panel is constituted and will provide the Panel with the most recent calculations as of the date that motion is fully submitted.

Respectfully submitted,

Dated: May 5, 2017　　　　　　　　　　ALSTON & BIRD LLP

*/s Adam J. Kaiser*

_____

Adam J. Kaiser
John M. Aerni
Eric Plourde
90 Park Avenue
New York, New York 10016-1387
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Email: adam.kaiser@alston.com
Email: john.aerni@alston.com
Email: eric.plourde@alston.com