# Exhibit B

# PAYMENT AGREEMENT

For

## Insurance and Risk Management Services

effective on the **01** day of **February, 2012**

by and between us,

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and all its affiliates including, but not limited to:

**American Home Assurance Company**
**The Insurance Company of the State of Pennsylvania**
**Commerce and Industry Insurance Company**
**Chartis Property Casualty Company**
**Illinois National Insurance Co**
**Chartis Casualty Company**
**Granite State Insurance Company**
**New Hampshire Insurance Company**

And *You*, our Client

***LANDSCAPE SPECIALISTS, INC***
***23676 BIRTCHER DR***
***LAKE FOREST   CA  92630-1769***

in consultation with *Your* representative

***SULLIVANCURTISMONROE INSURANCE***
***1920 MAIN ST, STE 600***
***IRVINE  CA  92614***

1

# PAYMENT AGREEMENT

## TABLE of CONTENTS

| | |
|---|---|
| Title Page | 1 |
| Table of Contents | 2 |
| Who Has Agreed To This Agreement? | 3 |
| What Have *You* And We Agreed To? | 3 |
| When Does This Agreement Begin? | 3 |
| When Will This Agreement End? | 3 |
| Which Words Have Special Meanings In This Agreement? | 3 |
| What Else Should *You* Know About *Your Payment Obligation*? | 4 |
| When Must *You* Pay *Your Payment Obligation*? | 4 |
| What Is the Payment Plan? | 4 |
| What Is the Billing Method? | 5 |
| What About Collateral? | 6 |
| What Is Default? | 7 |
| What May We Do In Case Of Default? | 7 |
| How Will Disagreements Be Resolved? | 8 |
| To Whom Must *You* and We Give Notices? | 9 |
| May Rights or Obligations be Assigned? | 9 |
| Will Past Forbearance Waive Rights under This Agreement? | 9 |
| Who Must Pay to Enforce This Agreement? | 9 |
| How May This Agreement Be Changed? | 9 |
| What If the Law Changes? | 9 |
| Are *You* Authorized to Make This Agreement? | 9 |
| Signatures | 10 |
| Schedule of Policies and Payments | Appended |

# PAYMENT AGREEMENT

## WHO HAS AGREED TO THIS AGREEMENT?

This Agreement is between:
- *You*, the organization(s) named as "our Client" in the *Schedule*, and
- us, the insurer(s) named in the *Schedule*.

The words "we", "us" and "our" in this Agreement refer to the insurer(s) named in the *Schedule*.

## WHAT HAVE *YOU* AND WE AGREED TO?

**We have agreed** to the following:
- to provide *You* insurance and services according to the *Policies* and other agreements; and
- to extend credit to *You* by deferring our demand for full payment of the entire amount of *Your Payment Obligation* if *You* make partial payments according to this Agreement.

To induce us to agree as above,
**You have agreed** to the following:
- to pay us all *Your Payment Obligation* and to perform all *Your* other obligations according to this Agreement and *Schedule* for all entities covered by the *Policies*;
- to provide us with collateral according to this Agreement and *Schedule*;

## WHEN DOES THIS AGREEMENT BEGIN?

This Agreement begins on the Effective Date shown in the first page (the title page) of this Agreement. Unless otherwise agreed in writing, this Agreement will also apply to any *Policies* and *Schedules* that we may issue as renewals, revisions, replacements or additions to the attached *Schedule* and the *Policies* listed there.

## WHEN WILL THIS AGREEMENT END?

This Agreement will end only after *You* and we have settled and paid all obligations between *You* and us relating to this Agreement. Neither *You* nor we may cancel this Agreement without the other's consent.

## WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?

Words with special meanings in the *Policies* have the same meanings in this Agreement as they have in the *Policies*. Non-italicized capitalized words in this Agreement are defined in the *Policies*, or their meanings are otherwise described in this Agreement.

The following are definitions of other special words. Terms printed in this Agreement in italic typeface have the meanings described below.

1. **"ALAE"** means Allocated Loss Adjustment Expense as defined in the *Policies*.
2. **"Deductible Loss Reimbursements"** means the portion of any *Loss* and *ALAE* we pay that *You* must reimburse us for under any "Deductible" or "Loss Reimbursement" provisions of a *Policy*.
3. **"Loss"** or **"Losses"** means damages, benefits or indemnity that we become obligated under the terms of the *Policies* to pay to claimants.
4. **"Policy"** or **"Policies"** means:
   - any of the insurance *Policies* described by their *Policy* numbers in the *Schedule*, and their replacements and renewals;
   - any additional insurance *Policies* that we may issue to *You* that *You* and we agree to make subject to this Agreement.
5. **"Retained Amount"** or **"Retention"** means one of the following:
   - **Self-Insured Retention:** the amount specified in the applicable *Policy* as *Your* Self-Insured Retention per occurrence, accident, offense, claim or suit; or
   - **Deductible:** the amount specified in the applicable *Policy* as the Reimbursable or Deductible portion of *Loss* per occurrence, accident, offense, claim or suit; or
   - **Loss Limit:** the portion of any *Loss* we pay because of an occurrence, offense, accident, claim or suit, that we will include in the computation of the premiums.

## PAYMENT AGREEMENT

The *Policies* show the type of *Retention* that applies to any specific occurrence, offense, accident, claim or suit.

6. **"Schedule"** means each of the attachments to this Agreement that describes specific elements of the Agreement for a specified period of time. Each *Schedule* is a part of this Agreement. Additional *Schedules* or amendments to *Schedules* may be attached to this Agreement from time to time by mutual agreement between *You* and us.

7. **"You"** or **"Your"** means the person or organization named as our Client in the title page of this Agreement, its predecessor and successor organizations, and each of its subsidiary, affiliated or associated organizations that are included as Named Insureds under any of the *Policies*. Each is jointly and severally liable to us for the entire amount of *Your Payment Obligation*.

8. **"Your Payment Obligation"** means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance *Policies* and agreements with us incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

   - the premiums and premium surcharges,
   - *Deductible Loss Reimbursements*,
   - any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *You* are a self-insurer,
   - any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

   **Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

## WHAT ELSE SHOULD *YOU* KNOW ABOUT *YOUR PAYMENT OBLIGATION*?

**Amounts:** We will calculate *Your Payment Obligation* according to the methods stated in the *Policies* and any other similar primary casualty insurance *Policies* and agreements between us.

*You* must abide by the results under this Agreement of any payment of *Loss* or *ALAE* that the claims service provider or we shall have made in the absence of negligence and in good faith under any of the *Policies*.

**Credit:** Credit is extended to *You* whenever *Your* payment of some or all of *Your Payment Obligation* is postponed beyond the effective date of the insurance *Policies* to which such obligations pertain. Any extension of unsecured credit to *You* under this Agreement is extended only for the duration of the *Policy* year for which it is extended. It is subject to review and revision or withdrawal at each anniversary of this Agreement or at other times in accordance with the terms of this Agreement. Any extension of credit to *You* under this Agreement, including any deferral or waiver of the collection of collateral from *You* is not an assumption by us of any of *Your* obligations to us. Any extension of credit to *You* does not limit our right to enforce *Your* performance under this Agreement.

A Credit Fee may be charged for any unsecured credit extended to *You*. The Credit Fee, if any, is shown in the *Schedule*. Any such Credit Fee is an annual fee and applies only to the *Policy* year to which such *Schedule* applies. A renewal Credit Fee may be charged for the period of any renewed extension of unsecured credit, and shall be shown in the *Schedule* pertaining thereto.

Payment of the Credit Fee, if any, is neither payment of premium for insurance of any kind nor payment of *Deductible Loss Reimbursements*.

## WHEN MUST *YOU* PAY *YOUR PAYMENT OBLIGATION*?

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment.

## WHAT IS THE PAYMENT PLAN?

# PAYMENT AGREEMENT

### Deposit and Installments

*You* must pay us a Deposit and Installments in the amounts and by the dates shown in the *Schedule* for the *Policies* described in the *Schedule*.

**Claims Payment Deposit:** If so shown in the *Schedule*, the Deposit includes a Claims Payment Deposit. The Claims Payment Deposit will not bear interest. We will return the amount of the Claim Payment Deposit to *You* when *You* have paid us all amounts due us.

If the total amount of claims we shall have paid on *Your* behalf exceeds the sum of the Claims Payment Deposit for three (3) consecutive billing periods, we may require *You* to pay us additional funds for the Claims Payment Deposit. However, the entire Claims Payment Deposit shall not exceed 250% of the average amount of the claims we had paid in each of the prior 3 periods.

### Additional Payments

*You* must also make payments in addition to the Deposit and Installments according to the Payment Method described under "Additional Payments" in the *Schedule*.

## WHAT IS THE BILLING METHOD?

**Deposit and Installments:** *You* must pay us the amounts shown in the *Schedule* as "Installments". *You* must pay us those amounts by their Due Dates shown there.

**Additional Payments:** *You* have chosen the **Direct Billing Method** or the **Automatic Withdrawal Method,** or a combination of both. *Your* choice is shown in the *Schedule*.

### Direct Billing Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will further bill *You* as necessary for the payment of *Losses* we must pay or have paid within *Your Retention* and *Your* share of *ALAE* covered by the *Policies*. We will not bill more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

### Automatic Withdrawal Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will draw funds from the "Automatic Withdrawal Account" described in the *Schedule* as necessary for the payment of *Losses* within *Your Retention* and *Your* share of *ALAE* covered by the *Policies*. We will not withdraw more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

*You* hereby authorize us to withdraw funds from that Account upon our demand.

*You* must pay enough cash into that "Automatic Withdrawal Account" to cover our expected payments of *Loss* within *Your Retention* and *Your* share of *ALAE* during the next Claims Payment Fund Coverage Period shown in the *Schedule*. The minimum amount of such cash funds is shown in the *Schedule* as "Minimum Amount". *You* must make a payment in that amount into that Account immediately whenever its balance falls below 25% of that amount. Interest earned on that Account belongs to *You*.

# PAYMENT AGREEMENT

## WHAT ABOUT COLLATERAL?

### Collateral is Required

*You* must deliver collateral acceptable to us to secure *Your Payment Obligation* at the time(s), in the form(s) and in the amount(s) shown in the *Schedule*. Subject to the terms of this Agreement, we may apply any collateral we hold in connection with this or any other similar primary casualty insurance *Policies* or agreements to *Your Payment Obligation*.

### Grant of Security Interest and Right to Offset

*You* grant us a possessory security interest in any property *You* deliver to us to secure *Your Payment Obligation*. *You* also grant us a continuing first-priority security interest and right of offset with respect to all premiums, surcharges, dividends, cash, accounts, or funds that are payable to *You* and are now or may in the future come into our possession in connection with *Your Payment Obligation*. *You* agree to assist us in any reasonable way to enable us to perfect our interest. *You* direct us to hold all such sums as collateral for *Your Payment Obligation* as they may be payable now or may become payable in the future.

### Letter of Credit

Any letter of credit must be clean, unconditional, irrevocable and evergreen. It must be from a bank that we and the Securities Valuation Office of the National Association of Insurance Commissioners have approved and in a form acceptable to us. It must be in the amount shown in the *Schedule*.

If any letter of credit is canceled, no later than 30 days before that letter of credit expires, *You* must deliver to us a substitute letter of credit that complies with the requirements set forth above. Upon *Your* written request, we will not unreasonably withhold our consent to a reasonable extension of the time within which *You* must deliver such a substitute letter of credit to us. The substitute letter of credit must take effect no later than the date of termination of the expiring letter of credit. *Your* duty to deliver such a letter of credit will continue until *You* have satisfied all *Your* obligations under this Agreement and the *Policies*. If *You* fail to provide us with a qualifying substitute letter of credit as indicated above, we may draw upon the existing letter of credit in full.

### Other Collateral

With respect to any collateral we accept other than a letter of credit, including but not limited to any collateral we hold in trust or escrow, any agreements between *You* and us about our respective rights and obligations with respect to such collateral are incorporated by reference into this Agreement. Nothing in those agreements will limit or modify any of our rights under this Agreement.

### Collateral Reviews

The collateral we require to secure *Your Payment Obligation* is subject to reviews and revisions as described below.

We will review our collateral requirement annually. In addition, we may review our collateral requirement at any time that we may deem reasonably necessary, including at any time after an event such as but not limited to the following:

1.  the non-renewal or cancellation of any *Policy* to which this Agreement applies,
2.  the failure or violation of any financial covenants or tests, or minimum financial rating (if any) specified in the *Schedule*,
3.  the occurrence of any direct or indirect transaction for the merger or consolidation, or the conveyance, sale, transfer, dividend, spin-off, lease, or sale and lease back, of all or any material portion of *Your* property, assets, business or equity to any other entity,
4.  any material adverse change in the financial condition of *You*, *Your* subsidiaries or affiliates taken separately or in combination, or any other entity on which we rely for security or guarantee in connection with this Agreement.

*You* and we will cooperate with each other and each other's designated consultants in the conduct of such reviews.

If as a result of any review we find that we require additional collateral, *You* will provide us such additional collateral within 30 days of our written request, which shall be accompanied by a worksheet showing our calculation of the amount thereof. If a return of collateral to *You* is indicated, we will return annually the indicated amount to *You* within 30 days of our written acknowledgement thereof.

# PAYMENT AGREEMENT

## Collateral Adjustment Procedure

The additional collateral that *You* must provide us will be in the amount of the difference between the total unpaid amount of *Your Payment Obligation* and the total amount of *Your* collateral that we then hold. We may adjust the collateral requirement relating to the unexpired term of the *Policies* on the basis of our evaluation of *Your* financial condition. If such difference is a negative sum, that sum is the amount that we will return to *You*. However, we are not obligated to return collateral to *You* if *You* are in default of any provision of this Agreement or any other similar agreement relating to *Your* primary casualty insurance with us.

## Financial Information

*You* must provide financial information to us as a basis for our collateral reviews within 14 days after our request. If *You* are not subject to the reporting requirements of the Securities and Exchange Act of 1934, *You* must provide us copies of *Your* audited annual financial statements.

If we so request, *You* must provide us such financial information as we may reasonably deem necessary to determine *Your* financial condition, including but not limited to copies of *Your* completed quarterly financial statements. Those statements must include the following:

. balance sheet,

. income statement,

. statement of retained earnings,

. cash flow statement,

. notes to the statements, and

. any supplemental schedules.

## Reporting Requirement

Give us prompt notice of the event of any default as described in the section titled "What is a Default", or any event described in the section titled "Collateral Reviews" in this Agreement, that has happened or is about to happen.

As an alternative to the above, at *Your* option, provide us with the same notices at the same time that *You* provide such notices to any other creditor regarding any material financial or operational condition that *You* are obligated to report to such other creditor.

# WHAT IS DEFAULT?

Default is any of the following:

1. failure by *You* or any of *Your* subsidiaries or affiliates to perform within 5 days after its due date any obligation *You* or any of *Your* subsidiaries or affiliates have under this Agreement or any other agreement with us.

2. *Your* insolvency, or the occurrence of any of the following:

    . the commencement of liquidation or dissolution proceedings, *Your* general failure to pay debts as they become due, general assignment by *You* for the benefit of creditors, the filing by or against *You* of any petition, proceeding, case or action under the provisions of the United States Bankruptcy Code or other such law relating to debtors, the appointment of, or the voluntary or involuntary filing for a petition for the appointment of, a receiver, liquidator, rehabilitator, trustee, custodian or similar official to take possession or control of any of *Your* property; or

    . *Your* default on any material outstanding debt not cured within its applicable cure period, if any.

3. the cancellation by *You*, without our prior consent, of any *Policy* material to this agreement. However, *Your* concurrent cancellation of <u>all</u> the unexpired *Policies* shall not constitute default.

4. the discovery of any material inaccuracy or incompleteness in any representation, warranty or condition precedent *You* make in connection with this Agreement, the insurance afforded by any of the *Policies* or *Your Payment Obligation*.

# WHAT MAY WE DO IN CASE OF DEFAULT?

If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following:

# PAYMENT AGREEMENT

1. We may declare the entire unpaid amount of *Your Payment Obligation* immediately due and payable.

2. We may change any or all unexpired *Policies* under Loss Reimbursement or Deductible plans to Non-Deductible plans for the remaining term of any such *Policy*, to become effective after ten days written notice to *You*. We will therewith increase the premiums for those *Policies* in accordance with our applicable rating plan.

3. We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of *Your Payment Obligations* under this Agreement or any other premium, surcharge or deductible financing agreement between *You* and us, or under any *Policies*. However we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

4. We may require *You* to deliver to us additional collateral, including an amendment to the letter of credit or an additional letter of credit or other additional collateral. The other additional collateral, letter of credit or its amendment must conform to the requirements described above. *You* must deliver it within 15 days of *Your* receipt of a written notice from us.

5. We may cancel any or all unexpired *Policies* as if for non-payment of premium or *Deductible Loss Reimbursements*. We may apply any return of premium resulting from the cancellation to remedy any default.

6. We may withhold payment of claims to *You* or any of *Your* subsidiaries or affiliates.

7. We may satisfy *Your* obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of *yours* received by, pledged to, held by or otherwise available to us in connection with *Your Payment Obligation*. *You* authorize us after any default to charge any account that *You* maintain with us in connection with *Your Payment Obligation* in order to satisfy any of *Your* obligations.

## HOW WILL DISAGREEMENTS BE RESOLVED?

### What if we disagree about payment due?

If *You* disagree with us about any amount of *Your Payment Obligation* that we have asked *You* to pay, within the time allowed for payment *You* must:

- give us written particulars about the items with which *You* disagree; and
- pay those items with which *You* do not disagree.

We will review the disputed items promptly and provide *You* with further explanations, details, or corrections. *You* must pay us the correct amounts for the disputed items within 10 days of agreement between *You* and us about their correct amount. Any disputed items not resolved within 60 days after our response to *Your* written particulars must immediately be submitted to arbitration as set forth below. With our written consent, which shall not be unreasonably withheld, *You* may have reasonable additional time to evaluate our response to *Your* written particulars.

So long as *You* are not otherwise in default under this Agreement, we will not exercise our rights set forth under "What May We Do in Case of Default?", pending the outcome of the arbitration on the disputed amount of *Your Payment Obligation*.

### What about disputes other than disputes about payment due?

Any other unresolved dispute arising out of this Agreement must be submitted to arbitration. *You* must notify us in writing as soon as *You* have submitted a dispute to arbitration. We must notify *You* in writing as soon as we have submitted a dispute to arbitration.

### Arbitration Procedures

**How arbitrators must be chosen:** *You* must choose one arbitrator and we must choose another. They will choose the third. If *You* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make an application to a Justice of the Supreme Court of the State of New York, County of New York and the Court will appoint the additional arbitrator or arbitrators.

**Qualifications of arbitrators:** Unless *You* and we agree otherwise, all arbitrators must be executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officials in an industry similar to *Yours*, domiciled in the United States of America not under the control of either party to this Agreement.

# PAYMENT AGREEMENT

**How the arbitration must proceed:** The arbitrators shall determine where the arbitration shall take place. The arbitration must be governed by the United States Arbitration Act, Title 9 U.S.C. Section 1, et seq. Judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof.

*You* and we must both submit our respective cases to the arbitrators within 30 days of the appointment of the third arbitrator. The arbitrators must make their decision within 60 days following the termination of the hearing, unless *You* and we consent to an extension. The majority decision of any two arbitrators, when filed with *You* and us will be final and binding on *You* and on us.

The arbitrators must interpret this Agreement as an honorable engagement and not merely a legal obligation. They are relieved of all judicial formalities. They may abstain from following the strict rules of law. They must make their award to effect the general purpose of this Agreement in a reasonable manner.

The arbitrators must render their decision in writing, based upon a hearing in which evidence may be introduced without following strict rules of evidence, but in which cross-examination and rebuttal must be allowed.

The arbitrators may award compensatory money damages and interest thereupon. They may order *You* to provide collateral to the extent required by this Agreement. They will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability. However, they will not have the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise.

**Expenses of Arbitration:** *You* and we must each bear the expense of our respective arbitrator and must jointly and equally bear with each other the expense of the third arbitrator and of the arbitration.

This Section will apply whether that dispute arises before or after termination of this Agreement.

## TO WHOM MUST *YOU* AND WE GIVE NOTICES?

We will mail or deliver all notices to *You* at *Your* address in the *Schedule*. *You* must mail or deliver all notices to our Law Representative with a copy to our Account Executive at the address specified in the *Schedule*. All notices must be in writing.

## MAY RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT BE ASSIGNED?

Neither *You* nor we may assign our rights or obligations under this Agreement without the written consent of the other, which shall not be unreasonably withheld.

## WILL PAST FORBEARANCE WAIVE RIGHTS UNDER THIS AGREEMENT?

Past forbearance, neglect or failure to enforce any or all provisions of this Agreement, or to give notice of insistence upon strict compliance with it, will not be a waiver of any rights. A waiver of rights in a past circumstance will not be a course of conduct that waives any rights in any subsequent circumstance.

## WHO MUST PAY TO ENFORCE THIS AGREEMENT?

If *You* or we fail to perform or observe any provisions under this Agreement, the other may incur reasonable additional expenses to enforce or exercise its remedies. Either *You* or we must reimburse the other upon demand and presentation of clear and convincing supporting evidence for any and all such additional expenses.

## HOW MAY THIS AGREEMENT BE CHANGED?

This Agreement may be changed only by agreement by *You* and us, as evidenced by a written addendum to this Agreement, duly executed by the authorized representatives of each.

## WHAT IF THE LAW CHANGES?

If any part of this Agreement should become unenforceable because of any change in law, the remainder of this Agreement will remain in full force and effect.

## ARE *YOU* AUTHORIZED TO MAKE THIS AGREEMENT?

*You* hereby represent and warrant that *Your* execution, delivery and performance of this Agreement have been authorized by all necessary corporate actions. The individual executing this agreement on *Your* behalf has full right and authority to execute and deliver this agreement and to bind *You* jointly and severally.

# PAYMENT AGREEMENT

## SIGNATURES

TO SIGNIFY AGREEMENT, *You* and we have caused this Agreement to be executed by the duly authorized representatives of each.

For **National Union Fire Insurance Company of Pittsburgh, Pa.,**

On behalf of itself and its affiliates first listed above:

In **Los Angeles, California,**

This _8th_ day of _August_ , _2012_

Signed by _Patricia Wright_

Typed Name **Patricia Wright**

Title **Authorized Representative**

For *You,* our Client

**LANDSCAPE SPECIALISTS, INC**

In _LAKE FOREST_ , _CA_,

This _2ND_ day of _AUGUST_ , _2012_

Signed by _____

Typed Name _Theresa E Hernandez_

Title _SEC/TRES_

# Mandatory Addendum

## to

## PAYMENT AGREEMENT

**By and between us**

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and all its affiliates including, but not limited to:

**American Home Assurance Company**

**The Insurance Company of the State of Pennsylvania**

**Commerce and Industry Insurance Company**

**Chartis Property Casualty Company**

**Illinois National Insurance Co.**

**Chartis Casualty Company**

**Granite State Insurance Company**

**New Hampshire Insurance Company**

**(Company, "we", "us" or "our")**

**and *You*, our Client**

***LANDSCAPE SPECIALISTS, INC***
***23676 BIRTCHER DR***
***LAKE FOREST   CA   92630-1769***

This Addendum is attached to and forms a part of the Payment Agreement entered into between Company and Client as of the <u>1st</u> day of <u>**February, 2013**</u>

1.  The section entitled **WHO HAS AGREED TO THIS AGREEMENT?,** is deleted and replaced with the following:

    This Agreement is between:

    .   *You*, the organization(s) named as "our Client" in the *Schedule*, and

    .   *us*, the insurers set forth above as "Company", "we", "us" and "our" in this Addendum.

2.  The section entitled **WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT? 8. - *Your* Payment Obligation,** is deleted and replaced with the following:

    **"*Your* Payment Obligation"** means the amounts that *You* must pay *us* for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with *us* incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

    .   the premiums and premium surcharges, taxes and assessments,

    .   *Deductible Loss Reimbursements,*

    .   any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *You* are a self-insurer,

    .   any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time,

    .   costs and expenses incurred by any third party administrator,

    .   any penalties or charges incurred as a result of *Your* failure to cooperate in the completion of an actual premium audit.

**Loss Reserves**: *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to *us*. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

**Taxes,Assessments and Surcharges** : The taxes, assessments and surcharges shown on the Schedule are based upon our knowledge of the current law in the states involved. If the law changes, or a rate or assessment changes, or a new surcharge is imposed, or a state reinterprets its law, any additional taxes, assessments and surcharges will become part of *Your* Payment Obligation.

3.  The section entitled: **WHAT ELSE SHOULD *YOU* KNOW ABOUT *YOUR* PAYMENT OBLIGATION?** is amended to include the following:

    We will contract with a Third Party Administrator (TPA) that *You* select for the adjustment of *Your* claims under the Policies provided that we consent to *Your* selection in advance. Our relationship with the TPA will be governed by a Claims Service Agreement (CSA) between *us* and the TPA, a copy of which will be made available to *You* upon *Your* request. Any TPA *You* select must meet all of our licensing requirements. Should we terminate the CSA at *Your* request or should the TPA no longer meet our service standards, we will enter into a CSA with another TPA. We will exercise good faith consistent with usual and customary commercial practice before we change one TPA to another TPA. Any amounts we pay to any TPA on *Your* behalf shall be considered part of *Your* Payment Obligation, and shall include, but not be limited to the following: cost of adjusting expense at new TPA; costs or losses incurred as a result of claims handling conduct of prior TPA, including fines and penalties; fines and penalties for failure to submit accurate data to regulatory bureaus; data transfer expense; costs to retrieve or recreate information not properly maintained by prior TPA; and costs to set up new escrow account.

4.  The section entitled: **WHEN MUST *YOU* PAY *YOUR* PAYMENT OBLIGATION?** is amended to include the following:

    All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment. If payment is not made when due, interest will accrue on the unpaid balance daily after the due date at the Prime Rate then in effect at Citibank, N.A., NY, NY, plus 150 basis points.

5.  The section entitled: **WHAT ABOUT COLLATERAL?** is amended to include the following:

    Collateral Exchange:

    At our sole discretion we may approve *Your* substitution or exchange of one form or instrument of collateral for another. Any replacement collateral must be in a form and drawn on a bank or insurer acceptable to *us*. If the original collateral was in the form of cash on which interest was being earned, a substitution may result in a change to the interest rate. We will not approve *Your* substitution or exchange of collateral if *You* are in Default of any of the terms of this Agreement or have triggered any applicable Financial Covenants, Tests or Minimum Credit Ratings shown in the Schedule.

6.  The section entitled: **WHAT MAY WE DO IN CASE OF DEFAULT?**, is deleted and replaced with the following:

    If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following:

    1.  We may declare the entire unpaid amount of *Your Payment Obligation* immediately due and payable.

    2.  [intentionally omitted]

    3.  We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of *Your Payment Obligation* under this Agreement or any other premium, surcharge or deductible financing agreement between *You* and us, or under any *Policies*. However, we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

    4.  We may require *You* to deliver to us additional collateral, including an amendment to the letter of credit or an additional letter of credit or other additional collateral. The other additional collateral, letter of credit or its

amendment must conform to the requirements described above. *You* must deliver it within 15 days of *Your* receipt of a written notice from us.

5. [intentionally omitted]

6. [intentionally omitted]

7. We may satisfy *Your* obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of *Yours* received by, pledged to, held by or otherwise available to us in connection with Your Payment Obligation. *You* authorize us after any default to charge any account that *You* maintain with us in connection with *Your Payment Obligation* in order to satisfy any of *Your* obligations.

7. The section entitled: **HOW WILL DISAGREEMENTS BE RESOLVED? ARBITRATION PROCEDURES - How Arbitrators Must Be Chosen**, is deleted and replaced with the following:

**How arbitrators must be chosen:** *You* must choose one arbitrator and we must choose another. They will choose the third. If *You* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make application only to a court of competent jurisdiction in the City, County, and State of New York. Similarly, any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of competent jurisdiction in the City, County, and State of New York.

8. The section entitled: **ARE *YOU* AUTHORIZED TO MAKE THIS AGREEMENT?** Is amended to include the following:

This Agreement together with the Schedules, Addenda, Policies and any related agreements between *You* and *us*, constitute the basis for a program of insurance coverage. We would not have entered into any of them without *Your* agreement on all of them. For that reason, *You* should review all such documents together when making any accounting, tax or legal determinations relating to the insurance program.

**IN WITNESS WHEREOF**, the parties hereto have caused this Addendum to be executed by their duly authorized representatives.

For **National Union Fire Insurance Company of Pittsburgh, Pa.,**

On behalf of itself and its affiliates first listed above:

In **Los Angeles,California,**

This _26_ day of _February_ _2013_

Signed by _D. Kelly_

Typed Name **David Salley**

Title **Authorized Representative**

For *You*, our Client

**LANDSCAPE SPECIALISTS, INC**

In _Lake Forest_, _CA_

This _20_ day of _February_, _2013_

Signed by _____

Typed Name _Thomas E. Hernandez_

Title _Secty/Treas._

# Mandatory Addendum

## to

# PAYMENT AGREEMENT

**By and between us**

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and all its affiliates including, but not limited to:

**American Home Assurance Company**

**The Insurance Company of the State of Pennsylvania**

**Commerce and Industry Insurance Company**

**AIG Property Casualty Company**

**Illinois National Insurance Co.**

**AIG Assurance Company**

**Granite State Insurance Company**

**New Hampshire Insurance Company**

**(Company, "we", "us" or "our")**

**and *You*, our Client**

***LANDSCAPE SPECIALISTS, INC***
***23676 BIRTCHER DR***
***LAKE FOREST   CA   92630-1769***

This Addendum is attached to and forms a part of the Payment Agreement entered into between Company and Client as of the <u>1st</u> day of <u>February, 2014</u>

1.  The section entitled **WHO HAS AGREED TO THIS AGREEMENT?**, is deleted and replaced with the following:

    This Agreement is between:

    .   *You*, the organization(s) named as "our Client" in the *Schedule*, and

    .   *us*, the insurers set forth above as "Company", "we", "us" and "our" in this Addendum.

2.  The section entitled **WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT? 8. - *Your* Payment Obligation**, is deleted and replaced with the following:

    " ***Your* Payment Obligation"** means the amounts that *You* must pay *us* for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with *us* incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

    .   the premiums and premium surcharges, taxes and assessments,

    .   *Deductible Loss Reimbursements,*

    .   any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *You* are a self-insurer,

    .   any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time,

    .   costs and expenses incurred by any third party administrator,

    .   any penalties or charges incurred as a result of *Your* failure to cooperate in the completion of an actual premium audit.

---

**Loss Reserves**: *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to *us*. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

**Taxes, Assessments and Surcharges** : The taxes, assessments and surcharges shown on the Schedule are based upon our knowledge of the current law in the states involved. If the law changes, or a rate or assessment changes, or a new surcharge is imposed, or a state reinterprets its law, any additional taxes, assessments and surcharges will become part of *Your* Payment Obligation.

3.  The section entitled: **WHAT ELSE SHOULD *YOU* KNOW ABOUT *YOUR* PAYMENT OBLIGATION?** is amended to include the following:

    We will contract with a Third Party Administrator (TPA) that *You* select for the adjustment of *Your* claims under the Policies provided that we consent to *Your* selection in advance. Our relationship with the TPA will be governed by a Claims Service Agreement (CSA) between *us* and the TPA, a copy of which will be made available to *You* upon *Your* request. Any TPA *You* select must meet all of our licensing requirements. Should we terminate the CSA at *Your* request or should the TPA no longer meet our service standards, we will enter into a CSA with another TPA. We will exercise good faith consistent with usual and customary commercial practice before we change one TPA to another TPA. Any amounts we pay to any TPA on *Your* behalf shall be considered part of *Your* Payment Obligation, and shall include, but not be limited to the following: cost of adjusting expense at new TPA; costs or losses incurred as a result of claims handling conduct of prior TPA, including fines and penalties; fines and penalties for failure to submit accurate data to regulatory bureaus; data transfer expense; costs to retrieve or recreate information not properly maintained by prior TPA; and costs to set up new escrow account.

4.  The section entitled: **WHEN MUST *YOU* PAY *YOUR* PAYMENT OBLIGATION?** is amended to include the following:

    All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment. If payment is not made when due, interest will accrue on the unpaid balance daily after the due date at the Prime Rate then in effect at Citibank, N.A., NY, NY, plus 150 basis points.

5.  The section entitled: **WHAT ABOUT COLLATERAL?** is amended to include the following:

    Collateral Exchange:

    At our sole discretion we may approve *Your* substitution or exchange of one form or instrument of collateral for another. Any replacement collateral must be in a form and drawn on a bank or insurer acceptable to *us*. If the original collateral was in the form of cash on which interest was being earned, a substitution may result in a change to the interest rate. We will not approve *Your* substitution or exchange of collateral if *You* are in Default of any of the terms of this Agreement or have triggered any applicable Financial Covenants, Tests or Minimum Credit Ratings shown in the Schedule.

6.  The section entitled: **WHAT MAY WE DO IN CASE OF DEFAULT?**, is deleted and replaced with the following:

    If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following

    1.  We may declare the entire unpaid amount of *Your Payment Obligation* immediately due and payable.

    2.  [intentionally omitted]

    3.  We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of *Your Payment Obligation* under this Agreement or any other premium, surcharge or deductible financing agreement between You and us, or under any *Policies*. However, we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

    4.  We may require *You* to deliver to us additional collateral, including an amendment to the letter of credit or an additional letter of credit or other additional collateral. The other additional collateral, letter of credit or its

amendment must conform to the requirements described above. *You* must deliver it within 15 days of *Your* receipt of a written notice from us.

5. [intentionally omitted]

6. [intentionally omitted]

7. We may satisfy *Your* obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of *Yours* received by, pledged to, held by or otherwise available to us in connection with Your Payment Obligation. You authorize us after any default to charge any account that You maintain with us in connection with *Your Payment Obligation* in order to satisfy any of *Your* obligations

7. The section entitled: **HOW WILL DISAGREEMENTS BE RESOLVED? ARBITRATION PROCEDURES - How Arbitrators Must be Chosen**, is deleted and replaced with the following:

**How arbitrators must be chosen:** *You* must choose one arbitrator and we must choose another. They will choose the third. If *You* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make application only to a court of competent jurisdiction in the City, County, and State of New York. Similarly, any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of competent jurisdiction in the City, County, and State of New York.

8. The section entitled: **ARE *YOU* AUTHORIZED TO MAKE THIS AGREEMENT?** Is amended to include the following:

This Agreement together with the Schedules, Addenda, Policies and any related agreements between *You* and *us*, constitute the basis for a program of insurance coverage. We would not have entered into any of them without *Your* agreement on all of them. For that reason, *You* should review all such documents together when making any accounting, tax or legal determinations relating to the insurance program.

**IN WITNESS WHEREOF**, the parties hereto have caused this Addendum to be executed by their duly authorized representatives.

For **National Union Fire Insurance Company of Pittsburgh, Pa.,**

On behalf of itself and its affiliates first listed above:

In **Los Angeles, California,**

This 18 day of July 2014

Signed by _____

Typed Name _____

Title **Authorized Representative**

**For *You*, our Client**

*LANDSCAPE SPECIALISTS, INC*

In Lake Forest , CA,

This 19 day of June , 2014

Signed by _____

Typed Name Thomas Hernandez

Title Vice President

# Schedule of Policies and Payments

## Paid Loss Payments Plan

Effective from 02/01/2012 to 02/01/2013

Annexed to the PAYMENT AGREEMENT

effective on **02/01/2012**

by and between us,

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and all its affiliates including, but not limited to:

**American Home Assurance Company**
**The Insurance Company of the State of Pennsylvania**
**Commerce and Industry Insurance Company**
**Chartis Property Casualty Company**
**Illinois National Insurance Co**
**Chartis Casualty Company**
**Granite State Insurance Company**
**New Hampshire Insurance Company**
and *You*, our Client

**LANDSCAPE SPECIALISTS, INC**
**23676 BIRTCHER DR**
**LAKE FOREST   CA  92630-1769**

on behalf of *You* and all *Your* subsidiaries or affiliates except those listed below:

For our use only: 371125

## List of Addressees for Notices and Other Purposes

### Your Address:

**Contact Name:**
**Company Name:** LANDSCAPE SPECIALISTS, INC
**Street:** 23676 BIRTCHER DR
**City:** LAKE FOREST    **State:** CA    **Zip:** 92630-1769 **Phone:**

### Your Representative:

**Contact Name:** Skip Jette
**Company Name:** SULLIVANCURTISMONROE INSURANCE
**Street:** 1920 MAIN ST, STE 600
**City:** IRVINE    **State:** CA    **Zip:** 92614    **Phone:** (951) 493-3301

### Our Account Executive:

**Contact Name:** Ray Reyna
**Company Name:** Chartis Insurance
**Street:** 777 So Figueroa, 16th Floor
**City:** Los Angeles    **State:** CA    **Zip:** 90017    **Phone:** (213) 689-3896

### Our Law Representative:

**Contact Name:** Virgina Doty
**Company Name:** Chartis Insurance
**Street:** 175 Water Street
**City:** New York    **State:** NY    **Zip:** 10038    **Phone:**

### Remit Payments to:

**Contact Name:**
**Company Name:** Chartis
**Street:** PO Box 10472
**City:** Newark    **State:** NJ    **Zip:** 07193    **Phone:**

### Remit Collateral to:

**Contact Name:** Attn: Mr. Donato DiLuzio
**Company Name:** Chartis
**Street:** P.O.Box 923 Wall Street Station
**City:** New York    **State:** NY    **Zip:** 10268    **Phone:**

**Contact Name:**
**Company Name:**
**Street:**
**City:**    **State:**    **Zip:**    **Phone:**

**Contact Name:**
**Company Name:**
**Street:**
**City:**    **State:**    **Zip:**    **Phone:**

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

**WC 021417723.**

Commercial General Liability Insurance

Automobile Liability Insurance

Other Insurance

Other Agreements (Describe)

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Payment No. | Due Date | Provision for Expenses And Excess Losses(1) | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses(2) | *Your Estimated Payment Obligation* |
|---|---|---|---|---|---|---|
| 1 | 02/01/2012 | $72,098 | $45,152 | $0 | $123,100 | $240,350 |
| 2 | 04/01/2012 | $32,040 | $0 | $0 | $0 | $32,040 |
| 3 | 05/01/2012 | $32,040 | $0 | $0 | $0 | $32,040 |
| 4 | 06/01/2012 | $32,040 | $0 | $0 | $0 | $32,040 |
| 5 | 07/01/2012 | $32,040 | $0 | $0 | $0 | $32,040 |
| 6 | 08/01/2012 | $32,040 | $0 | $0 | $0 | $32,040 |
| 7 | 09/01/2012 | $32,040 | $0 | $0 | $0 | $32,040 |
| 8 | 10/01/2012 | $32,040 | $0 | $0 | $0 | $32,040 |
| 9 | 11/01/2012 | $32,040 | $0 | $0 | $0 | $32,040 |
| 10 | 12/01/2012 | $32,040 | $0 | $0 | $0 | $32,040 |
| Subtotals | | $360,458 | $45,152 | $0 | $123,100 | $528,710 |
| DLP* | | N/A | N/A | N/A | $467,673 | $467,673 |
| DEP* | | $0 | $0 | $0 | N/A | $0 |
| Totals | | $360,458 | $45,152 | $0 | $590,773 | $996,383 |

DLP means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Regular Loss Payments" and "Sizeable Loss Payments" described below.

DEP means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

| Date | Type | Amount |
|---|---|---|
| N/A | N/A | N/A |

**Notes**
(1) "Provision for Expenses and Excess Losses" is a part of the Premium.

(2) "Provision for Limited Losses" includes provision for *Loss* within *Your Retention* (both Deductible and Loss Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is inclusive of the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

(3) The initial payment constitutes your deposit payment, and all payments thereafter are deemed installment payments

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

### 3. Additional Payments

In accordance with the loss billing periods provided in the loss billing chart below, we will report to You the amounts of Loss and ALAE that we have paid under the Policies. You must subsequently pay us as described below.

| LOB | Claims Vendor | Loss Billing Periods |
|-----|---------------|----------------------|
| WC | AIGCS | Monthly |

**Regular Loss Payments:** Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

We will bill *You* or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of *Loss* within *Your Retention* and *Your* share of *ALAE* that we will have paid under the *Policies*, less all amounts *You* will have paid us to date as such Regular Loss Payments and the Sizable Loss Payments described below.

**Sizable Loss Payments:** If we must make payment for any *Loss* within *Your Retention* and *Your* share of *ALAE* arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of **$0** , *You* must pay us the amount of that payment of *Loss* within 10 days after *You* receive our bill.

**Billing Method:**

☒ Billing to

☒ *You* at *Your* address shown in the *Schedule*, or

☐ *Your* Representative at its address shown in the *Schedule*; or

☐ Automatic Withdrawal from the account described below.

If Automatic Withdrawal Account applies: Minimum Amount:

Name of Depository Institution:

Address:

Account Number:

## 4. Conversion

The **Conversion Date** for each *Policy* described in section A above shall be the date _ months after the inception of such *Policy*.

On or shortly after the Conversion Date upon the presentation of our invoice, *You* must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *Policies*.

## C. Security Plan

### 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|------------------------------|----------------------|
| N/A | N/A |
| **Total Collateral on Hand** | $0 |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|------------------------------------------|----------------------|----------|
| Cash Security (Cash Collateral) | $83,698 | 02/01/2012 |
| Cash Security (Cash Collateral) | $76,795 | 04/01/2012 |
| Cash Security (Cash Collateral) | $76,795 | 06/01/2012 |
| Cash Security (Cash Collateral) | $76,795 | 08/01/2012 |
| Cash Security (Cash Collateral) | $76,795 | 10/01/2012 |

| | | |
|---|---|---|
| Cash Security (Cash Collateral) | $76,795 | 12/01/2012 |
| CLAIMS PAYMENT FUND | $123,100 | 02/01/2012 |
| **Total Additional Collateral Required** | **$590,773** | |
| **Total Collateral Required** | **$590,773** | |

## 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a.  Credit Trigger:

   i.   If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops to or below the grade shown respectively under S&P or Moody's, or

   ii.  If S&P or Moody's withdraws any such rating.

   We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

   "Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

**Name of Entity:** _____   **Type of Debt Rated:** _____

**Ratings at Effective Date**

| S&P | Moody's | Unsecured Exposure at Effective Date |
|---|---|---|
| | | |

**Potential Future Ratings**

| S&P | Moody's | Maximum Unsecured Exposure |
|---|---|---|
| | | |

b.  Other Financial Tests or Covenants:

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery. Adjustment of the credit fee shall not include an adjustment of any fees associated with your deferred premium payment plan.

## SIGNATURES

IN WITNESS WHEREOF, *You* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, **National Union Fire Insurance Company of Pittsburgh Pa.**, on behalf of itself and all its affiliates,

this __24th__ day of __April__ __2012__

Signed by _____

Typed Name **Robert J. Arzola**

Title **Authorized Representative**

For You: **LANDSCAPE SPECIALISTS, INC**

this __03__ day of __April__ , __2012__

Signed by _____

Typed Name __Thomas E. Hernandez__

Title __President__

# Schedule of Policies and Payments

## Paid Loss Payments Plan

Effective from 02/01/2013 to 02/01/2014

*Annexed to the* PAYMENT AGREEMENT

effective on **02/01/2013**

by and between us,

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and all its affiliates including, but not limited to:

**American Home Assurance Company**
**The Insurance Company of the State of Pennsylvania**
**Commerce and Industry Insurance Company**
**Chartis Property Casualty Company**
**Illinois National Insurance Co**
**Chartis Casualty Company**
**Granite State Insurance Company**
**New Hampshire Insurance Company**
and *You*, our Client

**LANDSCAPE SPECIALISTS, INC**
**23676 BIRTCHER DR**
**LAKE FOREST   CA  92630-1769**

on behalf of *You* and all *Your* subsidiaries or affiliates except those listed below:

---

For our use only: **371126**

---

## List of Addressees for Notices and Other Purposes

### Your Address:

**Contact Name:**
**Company Name:** LANDSCAPE SPECIALISTS, INC
**Street:** 23676 BIRTCHER DR
**City:** LAKE FOREST   **State:** CA   **Zip:** 92630-1769 **Phone:** (949) 581-9737

### Your Representative:

**Contact Name:** Skip Jette
**Company Name:** SULLIVANCURTISMONROE INSURANCE
**Street:** 1920 MAIN ST, STE 600
**City:** IRVINE   **State:** CA   **Zip:** 92614   **Phone:** (951) 493-3301

### Our Account Executive:

**Contact Name:** Ray Reyna
**Company Name:** AIG
**Street:** 777 So. Figueroa, 17th Floor
**City:** Los Angeles   **State:** CA   **Zip:** 90017   **Phone:** 213-689-3896

### Our Law Representative:

**Contact Name:** Virgina Doty
**Company Name:** AIG
**Street:** 175 Water Street
**City:** New York   **State:** NY   **Zip:** 10038   **Phone:**

### Remit Payments to:

**Contact Name:**
**Company Name:** Chartis
**Street:** PO Box 10472
**City:** Newark   **State:** NJ   **Zip:** 07193   **Phone:**

### Remit Collateral to:

**Contact Name:** Attn: Mr. Donato DiLuzio
**Company Name:** Chartis
**Street:** P.O.Box 923 Wall Street Station
**City:** New York   **State:** NY   **Zip:** 10268   **Phone:**

**Contact Name:**
**Company Name:**
**Street:**
**City:**   **State:**   **Zip:**   **Phone:**

**Contact Name:**
**Company Name:**
**Street:**
**City:**   **State:**   **Zip:**   **Phone:**

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

**WC 048250235.**

*Commercial General Liability Insurance*

Automobile Liability Insurance

Other Insurance

Other Agreements (Describe)

## B. Payment Plan:

### 1. *Cash Deposit, Installments and Estimated Deferred Amounts*

| Payment No. | Due Date | Provision for Expenses And Excess Losses(1) | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses(2) | *Your Estimated Payment Obligation* |
|---|---|---|---|---|---|---|
| 1 | 02/01/2013 | $97,514 | $32,350 | $0 | $0 | $129,864 |
| 2 | 04/01/2013 | $36,560 | $0 | $0 | $0 | $36,560 |
| 3 | 05/01/2013 | $36,560 | $0 | $0 | $0 | $36,560 |
| 4 | 06/01/2013 | $36,560 | $0 | $0 | $0 | $36,560 |
| 5 | 07/01/2013 | $36,560 | $0 | $0 | $0 | $36,560 |
| 6 | 08/01/2013 | $36,560 | $0 | $0 | $0 | $36,560 |
| 7 | 09/01/2013 | $36,560 | $0 | $0 | $0 | $36,560 |
| 8 | 10/01/2013 | $36,560 | $0 | $0 | $0 | $36,560 |
| 9 | 11/01/2013 | $36,560 | $0 | $0 | $0 | $36,560 |
| Subtotals | | $389,994 | $32,350 | $0 | $0 | $422,344 |
| DLP* | | N/A | N/A | N/A | $501,000 | $501,000 |
| DEP* | | $0 | $0 | $0 | N/A | $0 |
| Totals | | $389,994 | $32,350 | $0 | $501,000 | $923,344 |

**DLP** means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Regular Loss Payments" and "Sizeable Loss Payments" described below.

**DEP** means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

| Date | Type | Amount |
|---|---|---|
| N/A | N/A | N/A |

**Notes**

(1) "Provision for Expenses and Excess Losses" is a part of the Premium.

(2) "Provision for Limited Losses" includes provision for *Loss* within *Your Retention* (both *Deductible and Loss Limit*) and *Your* share of *ALAE*. Any "Deposit" in this column is inclusive of the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

(3) The initial payment constitutes your deposit payment, and all payments thereafter are deemed installment payments

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

### 3. Additional Payments

In accordance with the loss billing periods provided in the loss billing chart below, we will report to You the amounts of Loss and ALAE that we have paid under the Policies. You must subsequently pay us as described below.

| LOB | Claims Vendor | Loss Billing Periods |
|---|---|---|
| WC | Chartis Claims,Inc | Monthly |

**Regular Loss Payments:** Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

We will bill You or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of Loss within Your Retention and Your share of ALAE that we will have paid under the Policies, less all amounts You will have paid us to date as such Regular Loss Payments and the Sizable Loss Payments described below.

**Sizable Loss Payments:** If we must make payment for any Loss within Your Retention and Your share of ALAE arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of **$0**, You must pay us the amount of that payment of Loss within 10 days after You receive our bill.

**Billing Method:**

    ☒ Billing to

        ☐ You at Your address shown in the Schedule, or

        ☒ Your Representative at its address shown in the Schedule; or

    ☐ Automatic Withdrawal from the account described below.

If Automatic Withdrawal Account applies: Minimum Amount:

Name of Depository Institution:

Address:

Account Number:

## 4. Conversion

The **Conversion Date** for each Policy described in section A above shall be the date _ months after the inception of such Policy.

On or shortly after the Conversion Date upon the presentation of our invoice, You must pay in cash the entire unpaid amount of Your Payment Obligation for such Policies.

## C. Security Plan

### 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| Cash | $390,878 |
| Escrow | $123,100 |
| **Total Collateral on Hand** | $513,978 |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| Cash Security (Cash - Non Depleting) | $113,750 | 02/01/2013 |
| Cash Security (Cash - Non Depleting) | $52,814 | 04/01/2013 |
| Cash Security (Cash - Non Depleting) | $52,812 | 06/01/2013 |
| Cash Security (Cash - Non Depleting) | $52,812 | 08/01/2013 |

02/01/2013 05/03 9538090

| Cash Security (Cash - Non Depleting) | $52,812 | 10/01/2013 |
| **Total Additional Collateral Required** | **$325,000** | |
| **Total Collateral Required** | **$838,978** | |

## 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a. Credit Trigger:

    i. *If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops to or below the grade shown respectively under S&P or Moody's, or*

    ii. *If S&P or Moody's withdraws any such rating.*

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

**Name of Entity:** _____ **Type of Debt Rated:** _____

### Ratings at Effective Date

| S&P | Moody's | Unsecured Exposure at Effective Date |
|-----|---------|--------------------------------------|
|     |         |                                      |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|-----|---------|----------------------------|
|     |         |                            |

b. *Other Financial Tests or Covenants:*

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery. Adjustment of the credit fee shall not include an adjustment of any fees associated with your deferred premium payment plan.

## SIGNATURES

IN WITNESS WHEREOF, *You* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, **National Union Fire Insurance Company of Pittsburgh Pa.**, on behalf of itself and all its affiliates,

this **1st** day of **February, 2013**

Signed by _____

Typed Name **David Salley**

Title **Authorized Representative**

For You: **LANDSCAPE SPECIALISTS, INC**

this **20** day of **February**, **2013**

Signed by _____

Typed Name **Thomas E. Hernandez**

Title **Secty Treas.**

# Schedule of Policies and Payments

## Paid Loss Payments Plan

Effective from 02/01/2014 to 02/01/2015

Annexed to the PAYMENT AGREEMENT

effective on <u>02/01/2014</u>

by and between us,

National Union Fire Insurance Company of Pittsburgh, Pa.

On behalf of itself and all its affiliates including, but not limited to:

American Home Assurance Company

The Insurance Company of the State of Pennsylvania

Commerce and Industry Insurance Company

AIG Property Casualty Company

Illinois National Insurance Co

AIG Assurance Company

Granite State Insurance Company

New Hampshire Insurance Company

and *You*, our Client

**LANDSCAPE SPECIALISTS, INC**

**23676 BIRTCHER DR**

**LAKE FOREST   CA   92630-1769**

on behalf of *You* and all *Your* subsidiaries or affiliates except those listed below:

For our use only: 371127

Edition 1/99                    Paid Loss Payments Method                    Page 1 of 5
02/01/2014 001/01 9546900

## List of Addressees for Notices and Other Purposes

### *Your* Address:

Contact Name:
Company Name: LANDSCAPE SPECIALISTS, INC
Street: 23676 BIRTCHER DR
City: LAKE FOREST    State: CA    Zip: 92630-1769  Phone: (949) 581-9737

### *Your* Representative:

Contact Name: Skip Jette
Company Name: SULLIVANCURTISMONROE INSURANCE
Street: 1920 MAIN ST, STE 600
City: IRVINE    State: CA    Zip: 92614    Phone: (951) 493-3301

### Our Account Executive:

Contact Name: Ray Reyna
Company Name: AIG Construction
Street: 777 So. Figueroa, 17th Floor
City: Los Angeles    State: CA    Zip: 90017    Phone: (213) 689-3896

### Our Law Representative:

Contact Name: Virginia Doty
Company Name: American International Group
Street: 180 Maiden Lane
City: New York    State: NY    Zip: 10038    Phone:

### Remit Payments to:

Contact Name:
Company Name: AIG Property Casualty
Street: PO Box 10472
City: Newark    State: NJ    Zip: 07193    Phone:

### Remit Collateral to:

Contact Name: Attn: Mr. Donato DiLuzio
Company Name: AIG Property Casualty
Street: P.O.Box 923 Wall Street Station
City: New York    State: NY    Zip: 10268    Phone:

Contact Name:
Company Name:
Street:
City:    State:    Zip:    Phone:

Contact Name:
Company Name:
Street:
City:    State:    Zip:    Phone:

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

WC 049342351.

Commercial General Liability Insurance

Automobile Liability Insurance

Other Insurance

Other Agreements (Describe)

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Payment No. | Due Date | Provision for Expenses And Excess Losses(1) | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses(2) | *Your Estimated Payment Obligation* |
|---|---|---|---|---|---|---|
| 1 | 02/01/2014 | $116,544 | $41,585 | $0 | $0 | $158,129 |
| 2 | 03/01/2014 | $43,690 | $0 | $0 | $0 | $43,690 |
| 3 | 04/01/2014 | $43,690 | $0 | $0 | $0 | $43,690 |
| 4 | 05/01/2014 | $43,690 | $0 | $0 | $0 | $43,690 |
| 5 | 06/01/2014 | $43,690 | $0 | $0 | $0 | $43,690 |
| 6 | 07/01/2014 | $43,690 | $0 | $0 | $0 | $43,690 |
| 7 | 08/01/2014 | $43,690 | $0 | $0 | $0 | $43,690 |
| 8 | 09/01/2014 | $43,690 | $0 | $0 | $0 | $43,690 |
| 9 | 10/01/2014 | $43,690 | $0 | $0 | $0 | $43,690 |
| Subtotals | | $466,064 | $41,585 | $0 | $0 | $507,649 |
| DLP* | | N/A | N/A | N/A | $550,000 | $550,000 |
| DEP* | | $0 | $0 | $0 | N/A | $0 |
| Totals | | $466,064 | $41,585 | $0 | $550,000 | $1,057,649 |

DLP means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Regular Loss Payments" and "Sizeable Loss Payments" described below.

DEP means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

| Date | Type | Amount |
|---|---|---|
| N/A | N/A | N/A |

Notes
(1) "Provision for Expenses and Excess Losses" is a part of the *Premium*.

(2) "Provision for Limited Losses" includes provision for *Loss* within *Your Retention* (both Deductible and Loss Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is inclusive of the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

(3) The initial payment constitutes your deposit payment, and all payments thereafter are deemed installment payments

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

02/01/2014 001:01 9376900

29

### 3. Additional Payments

In accordance with the loss billing periods provided in the loss billing chart below, we will report to You the amounts of Loss and ALAE that we have paid under the Policies. You must subsequently pay us as described below.

| LOB | Claims Vendor | Loss Billing Periods |
|-----|---------------|----------------------|
| WC | AIG Claims, Inc. | Monthly |

**Regular Loss Payments:** Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

We will bill You or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of Loss within Your Retention and Your share of ALAE that we will have paid under the Policies, less all amounts You will have paid us to date as such Regular Loss Payments and the Sizable Loss Payments described below.

**Sizable Loss Payments:** If we must make payment for any Loss within Your Retention and Your share of ALAE arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of _$0_, You must pay us the amount of that payment of Loss within 10 days after You receive our bill.

Billing Method:

    ☒ Billing to

        ☐ You at Your address shown in the Schedule, or

        ☒ Your Representative at its address shown in the Schedule; or

    ☐ Automatic Withdrawal from the account described below.

If Automatic Withdrawal Account applies: Minimum Amount:

Name of Depository Institution:

Address:

Account Number:

### 4. Conversion

The Conversion Date for each Policy described in section A above shall be the date _ months after the inception of such Policy.

On or shortly after the Conversion Date upon the presentation of our invoice, You must pay in cash the entire unpaid amount of Your Payment Obligation for such Policies.

## C. Security Plan
### 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|------------------------------|----------------------|
| Cash | $766,267 |
| Escrow | $123,100 |
| Total Collateral on Hand | $889,367 |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|------------------------------------------|----------------------|----------|
| Cash Security (Cash Collateral) | $192,500 | 02/01/2014 |
| Cash Security (Cash Collateral) | $89,375 | 04/01/2014 |
| Cash Security (Cash Collateral) | $89,375 | 06/01/2014 |
| Cash Security (Cash Collateral) | $89,375 | 08/01/2014 |

0201\2014 001.01 9516900

| | | | |
|---|---|---|---|
| Cash Security (Cash Collateral) | | $89,375 | 10/01/2014 |
| Total Additional Collateral Required | | $550,000 | |
| Total Collateral Required | | $1,439,367 | |

## 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a. Credit Trigger:

  i. If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops to or below the grade shown respectively under S&P or Moody's, or

  ii. If S&P or Moody's withdraws any such rating.

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

Name of Entity: _____   Type of Debt Rated: _____

### Ratings at Effective Date

| S&P | Moody's | Unsecured Exposure at Effective Date |
|---|---|---|
| | | |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|---|---|---|
| | | |

b. Other Financial Tests or Covenants:

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery. Adjustment of the credit fee shall not include an adjustment of any fees associated with your deferred premium payment plan.

## SIGNATURES

IN WITNESS WHEREOF, *You* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, National Union Fire Insurance Company of Pittsburgh Pa., on behalf of itself and all its affiliates,

this 1st day of February, 2014

Signed by _____

Typed Name _____

Title Authorized Representative

For You: LANDSCAPE SPECIALISTS, INC

this 19 day of _____

Signed by _____

Typed Name Thomas E. Hernandez

Title Vice-President

# Mandatory Addendum

## to

# PAYMENT AGREEMENT

**By and between us**

**National Union Fire Insurance Company of Pittsburgh, Pa.**
On behalf of itself and all its affiliates including, but not limited to:

American Home Assurance Company

The Insurance Company of the State of Pennsylvania

Commerce and Industry Insurance Company

AIG Property Casualty Company

Illinois National Insurance Co.

AIG Assurance Company

Granite State Insurance Company

New Hampshire Insurance Company

(Company, "we", "us" or "our")

and *You*, our Client

*LANDSCAPE SPECIALISTS, INC*
*23676 BIRTCHER DR*
*LAKE FOREST   CA  92630-1769*

This Addendum is attached to and forms a part of the Payment Agreement entered into between Company and Client as of the <u>1st</u> day of <u>February, 2014</u>

1.  The section entitled WHO HAS AGREED TO THIS AGREEMENT?, is deleted and replaced with the following:

    This Agreement is between:

    .   *You*, the organization(s) named as "our Client" in the *Schedule*, and

    .   *us*, the insurers set forth above as "Company", "we", "us" and "our" in this Addendum.

2.  The section entitled WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT? 8. – *Your* Payment Obligation, is deleted and replaced with the following:

    " *Your* Payment Obligation"  means the amounts that *You* must pay *us* for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with *us* incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

    .   the premiums and premium surcharges, taxes and assessments,

    .   *Deductible Loss Reimbursements,*

    .   any amount that *we* may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *You* are a self-insurer,

    .   any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and *we* may agree from time to time,

    .   costs and expenses incurred by any third party administrator,

    .   any penalties or charges incurred as a result of *Your* failure to cooperate in the completion of an actual premium audit.

**Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to *us*. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

**Taxes,Assessments and Surcharges :** The taxes, assessments and surcharges shown on the Schedule are based upon our knowledge of the current law in the states involved. If the law changes, or a rate or assessment changes, or a new surcharge is imposed, or a state reinterprets its law, any additional taxes, assessments and surcharges will become part of *Your* Payment Obligation.

3. The section entitled: WHAT ELSE SHOULD *YOU* KNOW ABOUT *YOUR* PAYMENT OBLIGATION? is amended to include the following:

We will contract with a Third Party Administrator (TPA) that *You* select for the adjustment of *Your* claims under the Policies provided that we consent to *Your* selection in advance. Our relationship with the TPA will be governed by a Claims Service Agreement (CSA) between *us* and the TPA, a copy of which will be made available to *You* upon *Your* request. Any TPA *You* select must meet all of our licensing requirements. Should we terminate the CSA at *Your* request or should the TPA no longer meet our service standards, we will enter into a CSA with another TPA. We will exercise good faith consistent with usual and customary commercial practice before we change one TPA to another TPA. Any amounts we pay to any TPA on *Your* behalf shall be considered part of *Your* Payment Obligation, and shall include, but not be limited to the following: cost of adjusting expense at new TPA; costs or losses incurred as a result of claims handling conduct of prior TPA, including fines and penalties; fines and penalties for failure to submit accurate data to regulatory bureaus; data transfer expense; costs to retrieve or recreate information not properly maintained by prior TPA; and costs to set up new escrow account.

4. The section entitled: WHEN MUST *YOU* PAY *YOUR* PAYMENT OBLIGATION? is amended to include the following:

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment. If payment is not made when due, interest will accrue on the unpaid balance daily after the due date at the Prime Rate then in effect at Citibank, N.A., NY, NY, plus 150 basis points.

5. The section entitled: WHAT ABOUT COLLATERAL? is amended to include the following:

Collateral Exchange:

At our sole discretion we may approve *Your* substitution or exchange of one form or instrument of collateral for another. Any replacement collateral must be in a form and drawn on a bank or insurer acceptable to *us*. If the original collateral was in the form of cash on which interest was being earned, a substitution may result in a change to the interest rate. We will not approve *Your* substitution or exchange of collateral if *You* are in Default of any of the terms of this Agreement or have triggered any applicable Financial Covenants, Tests or Minimum Credit Ratings shown in the Schedule.

6. The section entitled: WHAT MAY WE DO IN CASE OF DEFAULT?, is deleted and replaced with the following:

If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following

1. We may declare the entire unpaid amount of *Your Payment Obligation* immediately due and payable.

2. [intentionally omitted]

3. We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of *Your Payment Obligation* under this Agreement or any other premium, surcharge or deductible financing agreement between *You* and us, or under any *Policies*. However, we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

4. We may require *You* to deliver to us additional collateral, including an amendment to the letter of credit or an additional letter of credit or other additional collateral. The other additional collateral, letter of credit or its

amendment must conform to the requirements described above. *You* must deliver it within 15 days of *Your* receipt of a written notice from us.

5. [intentionally omitted]

6. [intentionally omitted]

7. We may satisfy *Your* obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of *Yours* received by, pledged to, held by or otherwise available to us in connection with Your Payment Obligation. You authorize us after any default to charge any account that You maintain with us in connection with *Your Payment Obligation* in order to satisfy any of *Your* obligations

7. The section entitled: HOW WILL DISAGREEMENTS BE RESOLVED? ARBITRATION PROCEDURES - How Arbitrators Must Be Chosen, is deleted and replaced with the following:

How arbitrators must be chosen: *You* must choose one arbitrator and we must choose another. They will choose the third. If *You* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make application only to a court of competent jurisdiction in the City, County, and State of New York. Similarly, any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of competent jurisdiction in the City, County, and State of New York.

8. The section entitled: ARE *YOU* AUTHORIZED TO MAKE THIS AGREEMENT? is amended to include the following:

This Agreement together with the Schedules, Addenda, Policies and any related agreements between *You* and *us*, constitute the basis for a program of insurance coverage. We would not have entered into any of them without *Your* agreement on all of them. For that reason, *You* should review all such documents together when making any accounting, tax or legal determinations relating to the insurance program.

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be executed by their duly authorized representatives.

For National Union Fire Insurance Company of Pittsburgh, Pa.,

On behalf of itself and its affiliates first listed above:

In Los Angeles, California,

This ___ day of July, 2014

Signed by _____

Typed Name _____

Title Authorized Representative

For *You*, our Client

LANDSCAPE SPECIALISTS, INC

In Lake Forest, CA

This 19 day of June, 2014

Signed by _____

Typed Name Thomas Hernandez

Title Vice President

# Schedule of Policies and Payments

## Paid Loss Payments Plan

Effective from 02/01/2015 to 02/01/2016

Annexed to the PAYMENT AGREEMENT

effective on <u>02/01/2012</u>

by and between us,

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and all its affiliates including, but not limited to:

**American Home Assurance Company**
**The Insurance Company of the State of Pennsylvania**
**Commerce and Industry Insurance Company**
**AIG Property Casualty Company**
**Illinois National Insurance Co**
**AIG Assurance Company**
**Granite State Insurance Company**
**New Hampshire Insurance Company**
and *You*, our Client

**LANDSCAPE SPECIALISTS, INC**
**23676 BIRTCHER DR**
**LAKE FOREST   CA  92630-1769**

on behalf of *You* and all *Your* subsidiaries or affiliates except those listed below:

For our use only: 371128

---

## List of Addressees for Notices and Other Purposes

### *Your* Address:

**Contact Name:**
**Company Name:** LANDSCAPE SPECIALISTS, INC
**Street:** 23676 BIRTCHER DR
**City:** LAKE FOREST      **State:** CA        **Zip:** 92630-1769 **Phone:** (949) 581-9737

### *Your* Representative:

**Contact Name:** Skip Jette
**Company Name:** SULLIVANCURTISMONROE INSURANCE
**Street:** 1920 MAIN ST, STE 600
**City:** IRVINE      **State:** CA        **Zip:** 92614      **Phone:** (951) 493-3301

### Our Account Executive:

**Contact Name:** Robert Brooks
**Company Name:** AIG Construction and Energy
**Street:** 777 S. Figueroa St., 17th Floor
**City:** Los Angeles      **State:** CA        **Zip:** 90017      **Phone:**

### Our Law Representative:

**Contact Name:** Virginia Doty
**Company Name:** American International Group
**Street:** 180 Maiden Lane
**City:** New York      **State:** NY        **Zip:** 10038      **Phone:**

### Remit Payments to:

**Contact Name:**
**Company Name:** AIG Property Casualty
**Street:** PO Box 10472
**City:** Newark      **State:** NJ        **Zip:** 07193      **Phone:**

### Remit Collateral to:

**Contact Name:** Attn: Mr. Donato DiLuzio
**Company Name:** AIG Property Casualty
**Street:** P.O.Box 923 Wall Street Station
**City:** New York      **State:** NY        **Zip:** 10268      **Phone:**

**Contact Name:**
**Company Name:**
**Street:**
**City:**      **State:**        **Zip:**      **Phone:**

**Contact Name:**
**Company Name:**
**Street:**
**City:**      **State:**        **Zip:**      **Phone:**

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

WC 049342509.

Commercial General Liability Insurance

Automobile Liability Insurance

Other Insurance

Other Agreements (Describe)

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Payment No. | Due Date | Provision for Expenses And Excess Losses(1) | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses(2) | *Your Estimated Payment Obligation* |
|---|---|---|---|---|---|---|
| 1 | 02/01/2015 | $109,329 | $40,295 | $0 | $0 | $149,624 |
| 2 | 03/01/2015 | $40,998 | $0 | $0 | $0 | $40,998 |
| 3 | 04/01/2015 | $40,998 | $0 | $0 | $0 | $40,998 |
| 4 | 05/01/2015 | $40,998 | $0 | $0 | $0 | $40,998 |
| 5 | 06/01/2015 | $40,998 | $0 | $0 | $0 | $40,998 |
| 6 | 07/01/2015 | $40,998 | $0 | $0 | $0 | $40,998 |
| 7 | 08/01/2015 | $40,998 | $0 | $0 | $0 | $40,998 |
| 8 | 09/01/2015 | $40,998 | $0 | $0 | $0 | $40,998 |
| 9 | 10/01/2015 | $40,998 | $0 | $0 | $0 | $40,998 |
| Subtotals | | $437,313 | $40,295 | $0 | $0 | $477,608 |
| DLP* | | N/A | N/A | N/A | $797,542 | $797,542 |
| DEP* | | $0 | $0 | $0 | N/A | $0 |
| Totals | | $437,313 | $40,295 | $0 | $797,542 | $1,275,150 |

**DLP** means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Regular Loss Payments" and "Sizeable Loss Payments" described below.

**DEP** means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

| Date | Type | Amount |
|---|---|---|
| N/A | N/A | N/A |

**Notes**

(1) "Provision for Expenses and Excess Losses" is a part of the Premium.

(2) "Provision for Limited Losses" includes provision for *Loss* within *Your Retention* (both Deductible and Loss Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is inclusive of the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

(3) The initial payment constitutes your deposit payment, and all payments thereafter are deemed installment payments

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

### 3. Additional Payments

In accordance with the loss billing periods provided in the loss billing chart below, we will report to You the amounts of Loss and ALAE that we have paid under the Policies. You must subsequently pay us as described below.

| LOB | Claims Vendor | Loss Billing Periods |
|---|---|---|
| WC | AIG Claims, Inc. | Monthly |

**Regular Loss Payments:** Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

We will bill You or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of Loss within Your Retention and Your share of ALAE that we will have paid under the Policies, less all amounts You will have paid us to date as such Regular Loss Payments and the Sizable Loss Payments described below.

**Sizable Loss Payments:** If we must make payment for any Loss within Your Retention and Your share of ALAE arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of  $0 , You must pay us the amount of that payment of Loss within 10 days after You receive our bill.

**Billing Method:**

    ☒ Billing to

        ☐ You at Your address shown in the Schedule, or

        ☒ Your Representative at its address shown in the Schedule; or

    ☐ Automatic Withdrawal from the account described below.

If Automatic Withdrawal Account applies: Minimum Amount:

Name of Depository Institution:

Address:

Account Number:

## 4. Conversion

The **Conversion Date** for each Policy described in section A above shall be the date _ months after the inception of such Policy.

On or shortly after the Conversion Date upon the presentation of our invoice, You must pay in cash the entire unpaid amount of Your Payment Obligation for such Policies.

# C. Security Plan

## 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| Cash | $1,297,985 |
| Escrow | $123,100 |
| **Total Collateral on Hand** | $1,421,085 |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| Cash Security (Cash - Non Depleting) | $64,955 | 02/01/2015 |
| Cash Security (Cash - Non Depleting) | $30,158 | 04/01/2015 |
| Cash Security (Cash - Non Depleting) | $30,158 | 06/01/2015 |
| Cash Security (Cash - Non Depleting) | $30,158 | 08/01/2015 |

| | | |
|---|---|---|
| Cash Security (Cash - Non Depleting) | $30,158 | 10/01/2015 |
| **Total Additional Collateral Required** | **$185,587** | |
| **Total Collateral Required** | **$1,606,672** | |

## 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a. Credit Trigger:

   i. If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops to or below the grade shown respectively under S&P or Moody's, or

   ii. If S&P or Moody's withdraws any such rating.

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

Name of Entity: _____   Type of Debt Rated: _____

### Ratings at Effective Date

| S&P | Moody's | Unsecured Exposure at Effective Date |
|---|---|---|
| | | |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|---|---|---|
| | | |

b. Other Financial Tests or Covenants:

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery. Adjustment of the credit fee shall not include an adjustment of any fees associated with your deferred premium payment plan.

## SIGNATURES

IN WITNESS WHEREOF, *You* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, **National Union Fire Insurance Company of Pittsburgh Pa.,** on behalf of itself and all its affiliates,

this 7th day of August , 2015

Signed by _Steven E. Fuly_

Typed Name _Steven E. Desiel_

Title _Attorney in fact_

For *You:* **LANDSCAPE SPECIALISTS, INC**

this 24 day of June , 2015

Signed by _____

Typed Name _Thomas E. Hernandez_

Title _Secty. Treas._